**CV  09   974**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
U.S. DISTRICT COURT E.D.N.Y

MAR 10 2009

LONG ISLAND OFFICE

WEXLER, J.

BOYLE, M.

———————————————————————X

INTELLIGENT DIGITAL SYSTEMS, LLC,
RUSS & RUSS PC DEFINED BENEFIT
PENSION PLAN, and JAY EDMOND RUSS,

Plaintiffs,

-against-

VISUAL MANAGEMENT SYSTEMS, INC.,
JASON GONZALEZ, HOWARD HERMAN,
ROBERT MOE, MICHAEL RYAN,
COL. JACK JACOBS, Ret., and MARTY McFEELY,

Defendants.

———————————————————————X

Case No.: CV

**COMPLAINT**
(Jury Trial Demanded)

Plaintiffs, INTELLIGENT DIGITAL SYSTEMS, LLC, RUSS & RUSS PC DEFINED

BENEFIT PENSION PLAN, and JAY EDMOND RUSS, by their attorneys, REED SMITH LLP,

and IRA LEVINE, ESQ., complaining of the defendants, state as follows:

## NATURE OF THE ACTION, PARTIES AND BACKGROUND

1.      This action involves claims of negligence, common law fraud, securities fraud,

breach of contract and non-payment of promissory notes.  The events relate to a sale of proprietary

digital video recording technology and other assets by Plaintiff INTELLIGENT DIGITAL

SYSTEMS, LLC ("IDS"), pursuant to written agreement made on April 2, 2008, and related

consulting and other agreements, and the issuance by the defendant VISUAL MANAGEMENT

SYSTEMS, INC. ("VMS")  of an Unsecured Convertible Promissory Note (hereinafter referred to

as the "Sale Transaction.")

2.      The individual defendants are officers and/or directors of VMS, except for

HOWARD HERMAN ("HERMAN"), who is a former officer of VMS.  The individual defendants

1

were privy to adverse facts consisting of non-public information concerning the business, finances, bookkeeping, accounting, internal controls, sales, and prospects of VMS, through access to internal corporate documents, conversations, connections with officers and employees, attendance at management and Board of Directors meetings and committees, and information provided to them.

3.     Based upon their knowledge and possession of such information, the individual defendants were careless and negligent in discharging their fiduciary duties, financial reporting duties, management duties, obligations under the Sarbanes-Oxley Act, and through acts and omissions constituting negligence and culpable conduct, by allowing publicly filed financial information to be wrong, materially false, misleading and stale.

4.     The adverse facts and non-public information related to: a) the true financial status of VMS, which was contrary to the publicly filed financial information for the periods ending August 31, 2007 and September 30, 2007; b) the fact that the publicly filed financial information for the periods ending August 31, 2007 and September 30, 2007 was wrong and materially misleading; c) that IDS and Plaintiff JAY EDMOND RUSS ("RUSS"), and the public could not, and should not, rely upon the publicly filed financial information of VMS;  d) the fact that material errors had been committed by VMS's then-Chief Financial Officer, HERMAN;  e) the fact that the termination of HERMAN on or about February 18, 2008 as the Chief Financial Officer of VMS, was "for cause" (this was after the binding Letter of Intent but before the closing of the Sale Transaction); f) the true reasons for the delay in 10-K and other public filings, the true reasons for delay in publicly filing the financial results of VMS as of December 31, 2007, the true reasons for delay in publicly filing the financial results of VMS as of March 31, 2008; g) weaknesses in internal financial controls of VMS; h) the work required, and estimated or projected cost to correct the errors and deficiencies in

2

public filings and financial reporting; i) that VMS did not have sufficient funds to pay for the professional services necessary to correct the errors and deficiencies in public filings and financial reporting; j) that VMS would be forced to raise additional equity or obtain loans, or would be forced to curtail operations to pay for such professional services; k) that the cost of such professional services was material, and would, or likely could render VMS insolvent; and l) that VMS likely would not have the funds to pay IDS and RUSS pursuant to the Sale Transaction, promissory notes, consulting fees, or to pay the development fees (collectively hereinafter, the "Adverse Facts.")

5.    The Adverse Facts were known, or with the exercise of reasonable care and diligence, could have and should have been known to VMS and the individual defendants prior to both a binding Letter of Intent between IDS and VMS, the actual execution of agreements, and the closing of the Sale Transaction on April 2, 2008, but were not disclosed to IDS and RUSS, and the public, and then, later, only partially disclosed, six (6) days after the closing of the Sale Transaction.

6.    Based upon their possession of such information, the individual defendants, knew, or should have known, the fact that the Adverse Facts had not been disclosed, or were being actively concealed from IDS and RUSS, and the public.

7.    Plaintiffs had no access to the Adverse Facts, which were solely under defendants' control.   The individual defendants were involved in drafting, producing, reviewing, and/or disseminating materially false and misleading statements.  The individual defendants were aware of, or in the exercise of reasonable care, should have been aware, that materially false and misleading statements were being issued regarding VMS and nevertheless, approved, ratified and/or failed to correct those statements in violation of applicable securities laws.

3

8.     IDS and RUSS reasonably relied upon the accuracy of public information and statements put forth by VMS and the individual defendants to reach a comfort level that VMS could, and likely would, be able to pay, and would pay, the sale price, promissory notes, consulting fees and the development fees under the Development Agreement and would otherwise perform its obligations in accordance with the agreements executed and delivered at the closing. In proceeding with the Sale Transaction, IDS and RUSS reasonably relied upon the accuracy of public information and statements by VMS in ceasing IDS business operations, in ceasing technical support of previously sold digital video recording devices in the field, in ceasing technical support of customers, in transitioning all of IDS's business to VMS, in restructuring the relationship with IDS's Chief Technology Officer so that he could receive an E-visa and be paid through the Development Agreement, in pursuing all of the conditions of closing including, the engagement of securities counsel and immigration counsel to pursue and obtain the E-visa, in providing funding for a new company as part of the E-visa process, in terminating employees, in arranging and paying for the services of IDS's President, Elliott Jonas, as a consultant to VMS after the closing of the Sale Transaction, in causing its certified public accountants to audit its financial statements, in delivering its unique and proprietary technology to VMS, in revealing its technological trade secrets to VMS, in delivering it source code to VMS and its "know how" in the development, manufacture and sale of digital video recorders, in thereby allowing VMS to bring to market shortly after the closing of the Sale Transaction, a unique and proprietary "True Hybrid" digital video recorder, and in otherwise dismantling and discontinuing the IDS business.

4

9.     IDS and RUSS reasonably relied upon the August 31, 2007 and September 30, 2007 publicly filed financial statements of VMS in executing and exchanging a binding Letter of Intent, and in closing the Sale Transaction and executing all related agreements.

10.     IDS and RUSS reasonably relied upon the accuracy of the August 31, 2007 and September 30, 2007 publicly filed financial statements of VMS, particularly when VMS had not publicly filed its December 31, 2007 nor its March 31, 2008 financial statements, and did not take any steps to caution against such reliance.

11.     Plaintiffs IDS and RUSS reasonably relied upon VMS e-mails and press releases. None of these disclosed the Adverse Facts.

12.     The non-disclosure of the Adverse Facts was misleading because IDS and RUSS, as investors in VMS and as creditors upon the closing on April 2, 2008, were not on notice of the true reasons for any of the matters set forth above, and were led to believe that there were other less disturbing reasons why HERMAN was terminated as VMS's Chief Financial Officer, and why the public financial filings were late.

13.     Concealment of the Adverse Facts by VMS and the individual defendants resulted in enhancement of all share and stock option values, and enhanced potential values, to the benefit of VMS and the individual defendants. This enhanced value was realized by the acquisition of IDS's unique proprietary technology and the engagement of IDS's Chief Technology Officer, Ho Sung Chang ("Chang"), through exclusive contractual arrangements through the Development Agreement, with a company, known as HC Digital Video Development Corp. ("HC") under Chang direction. Defendant JASON GONZALEZ ("GONZALEZ"), either alone, or with his wife, who also was, and is, a VMS officer and employee, or through trusts or entities in his, her, or their

5

control were and are the majority shareholder of VMS.  Each Board member owned either shares, or possessed stock options, or both.  Each Board member earned or acquired stock options at every Board and committee meeting.  The concealment of the Adverse Facts and enhanced values, and enhanced potential values, resulted from VMS's  and the individual defendants' negligence, negligent oversight, and failures to implement and use monitoring and other procedures, to assure that the Adverse Facts were appropriately disclosed in a timely manner.

## JURISDICTION AND VENUE

14.    Jurisdiction is conferred by  §27 of the Securities Exchange Act of 1934 (15 U.S.C. §78a et. seq.; the "1934 Act")  and 28 U.S.C.  §1331.  The securities claims asserted herein arise under  §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

15.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  At all times relevant to this action, Plaintiffs maintained their principal places of business within the Eastern District of New York, and many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this district and defendants transact business in the district.

16.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

17.    Pursuant to 28 U.S.C. §1367, the Court has supplemental jurisdiction over the claims arising from the laws of the State of New York (the "State Claims").  The State Claims are so related to the claims over which the Court has original jurisdiction, and have a common nucleus of

operative facts, that they form part of the same case or controversy under Article III of the United State Constitution.

18.     IDS is a Delaware limited liability company, with its sole place of business on Long Island, New York and is authorized to do business in the State of New York.   Prior to the Sale Transaction, IDS maintained development and sales offices in West Islip, New York.   Following the Sales Transaction, IDS maintains an office c/o Russ & Russ, P.C. ("Russ P.C.") in Massapequa, New York.   IDS is the developer and, prior to the Sale Transaction, was the owner of proprietary technology in the area of digital video recording for the security industry, and the manufacturer and seller of a proprietary digital video recorder ("DVR").   IDS is wholly owned by RUSS.

19.     RUSS is an attorney, who is admitted to practice law in the State of New York. RUSS has been in private general practice for thirty-three (33) years, and is President of Russ P.C., which maintains its offices at 543 Broadway, Massapequa, New York.   RUSS is a resident of Suffolk County, New York, and resides in Lloyd Harbor, New York.

20.     Russ P.C. maintains a defined benefit pension plan known as RUSS & RUSS PC DEFINED BENEFIT PENSION PLAN ("THE PLAN").

21.     VMS is a Nevada corporation, which maintains its principle place of business at 1000 Industrial Way North, Suite C, Toms River, New Jersey 08755.   VMS sells and installs DVRs and provides other security goods and services, nationally.   VMS was a private company, but became a public company before the binding Letter of Intent or the Sales Transaction.   VMS is traded under the symbol "vmsy.ob."

22.    Defendant, GONZALEZ founded VMS, and is the Chairman of the Board of Directors, Chief Executive Officer, President and employee of VMS.  GONZALEZ resides in New Jersey.

23.    HERMAN is the former Chief Financial Officer ("CFO"), and a former employee of VMS.  Upon information and belief, HERMAN is a resident of New Jersey.

24.    HERMAN was terminated, "for cause" as CFO and employee of VMS on or about February 18, 2008, as confirmed by a public announcement by VMS. At that time, VMS was a public company.

25.    ROBERT MOE ("MOE")  was and is a member of the Board of Directors of VMS. Upon information and belief, MOE is a resident of New Jersey.

26.    MICHAEL RYAN ("RYAN") was and is a member of the Board of Directors of VMS.  Upon information and belief, RYAN is a resident of Connecticut.

27.    COL. JACK JACOBS, Ret. ("JACOBS") was and is a member of the Board of Directors of VMS.  Upon information and belief, JACOBS is a resident of New Jersey.

28.    MARTY McFEELY ("McFEELY") was and is a member of the Board of Directors of VMS.  Upon information and belief, McFEELY is a resident of New Jersey.

29.    VMS is vicariously liable for the acts and omissions, and culpable conduct, and negligent and fraudulent conduct of GONZALEZ and HERMAN, in that all such conduct was performed as employees and officers of VMS, and in the scope of such employment.

30.    VMS is vicariously liable for the acts and omissions, and culpable conduct, and negligent and fraudulent conduct of its Board of Directors, in that all such conduct was performed as directors of VMS, and in the scope of such engagement.

## EVENTS LEADING TO A BINDING LETTER OF INTENT

31.     During 2006, RUSS and IDS's investment bankers met with and spoke to GONZALEZ and HERMAN.  Thereafter, IDS and VMS agreed in principle to merge. However, VMS and GONZALEZ decided to delay any transaction with IDS because VMS was planning to "go public."  VMS became a public company through a reverse-merger on June 15, 2007.

32.     In a press release dated September 18, 2007, GONZALEZ was quoted as stating: "Since commencing operations in 2003, our company has grown at a blistering pace with revenues exceeding $4 million in 2006 and over $11 million since inception.  We are committed to maintaining our proven track record of delivering impressive growth and shareholder value."

33.     In the same press release, VMS and GONZALEZ also stated:  "Moving forward, the company is implementing a growth strategy that includes an aggressive marketing plan which will expand its sales force, establish telemarketing centers and increase its regional and satellite offices geographically."

34.     During 2007, VMS and IDS agreed to change the structure of the transaction from a merger to an asset sale, consisting, generally, of the following: a) the sale by IDS to VMS of certain assets, including all of IDS's proprietary technology assets, but not IDS's rights, if any, under certain patent applications; b) a long-term consulting arrangement between VMS and RUSS; c) a non-managing membership interest of VMS in IDS Patent Holding Corp.; d) the Development Agreement between VMS and HC; and e) a License of rights from IDS Patent Holding Corp. to VMS.

35.     In December, 2007, IDS and VMS entered into a non-binding Letter of Intent.

9

36.    In connection with a proposed binding Letter of Intent, IDS and RUSS reviewed, and relied upon, the statements and representations contained in the August 31, 2007 and September 30, 2007 public filings of financial information made by VMS.  Such statements and representations contained the work product of HERMAN.  In connection with a proposed binding Letter of Intent, VMS and the individual defendants provided no other, different, or additional financial information, expecting and leaving IDS to rely on the statements and representations contained in the public filings of financial information.

37.    The failure of VMS and the individual defendants to provide other, different, or additional financial information, was materially misleading, in that the financial condition of VMS was compromised, and not as was represented to IDS and RUSS, and the public in VMS's August 31, 2007 and September 30, 2007 financial statements.  Without limiting the foregoing, VMS and the individual defendants knew, or should have known, but failed to disclose, that inventory was materially overstated, accounts payable were materially overstated, additional paid in capital was materially understated, gross profit was materially overstated, operating expenses were materially overstated, all such that there was an additional loss for the three months ended August 31, 2007, and gross profit was materially overstated, and net loss was understated, for the six months ended August 31, 2007, and inventory was materially overstated, accounts payable were materially overstated, additional paid in capital was materially understated, revenue was materially overstated, gross profit was materially overstated, and operating expenses were materially understated, all such that there was an additional loss for the quarter ended September 30, 2007, and gross profit was materially overstated and net loss was understated, for the six month period ended September 30, 2007, and VMS suffered from a poor cash position, the need to find and close equity and/or loan

10

transactions to keep VMS in operation, the need to do so to meet required payments in the Sale Transaction, and that without such equity/loan transactions, VMS would likely immediately default in making payments after the closing of the Sale Transaction to IDS and RUSS, and under the Development Agreement, and the defaults and non-payment of accounts receivable due VMS in its municipal contracts, and the threatened cessation by vendors of VMS of selling product to VMS, and material weaknesses in bookkeeping, accounting and tax reporting functions of VMS. In connection with these matters, and in connection with the performance of HERMAN, the Audit Committee of the Board of Directors, and the Board, failed to perform any reasonable review, investigation, oversight, or other supervisory function.

38.    HERMAN, as CFO and as a certified public accountant ("CPA"), had responsibilities and authority over the financial, bookkeeping, accounting and tax matters of VMS, reporting to GONZALEZ, who lacked the knowledge and experience to properly supervise HERMAN, and evaluate his performance, and to the Audit Committee, and the Board. HERMAN lacked the experience, knowledge and capacity to do his job, and failed to perform his duties and responsibilities in a competent and appropriate manner. GONZALEZ, the Audit Committee of the Board of Directors, and the Board, should have known, and with proper inquiry and oversight would have known, that HERMAN lacked the ability and failed to perform his duties and responsibilities in a competent and appropriate manner.

39.    Unknown to IDS and RUSS, or the public, on or about November and December of 2007, GONZALEZ and the Audit Committee of VMS, and VMS, learned, or were informed that VMS's August 2007 and September 2007 financial statements and public filings of financial information were erroneous, deficient, inaccurate and needed to be restated.

40.     Unknown to IDS and RUSS, and the public, in or about November and December of 2007, VMS engaged the services of Withum Smith & Brown Global Assurance ("WSBGA") to evaluate VMS's internal controls over financial reporting, and to assist VMS in developing internal controls to comply with Section 404 of the Sarbanes-Oxley Act of 2002, and received reports, advice and recommendations from WSBGA.

41.     On or about January 31, 2008, IDS and VMS entered into the binding Letter of Intent.

## THE TERMINATION OF HERMAN

42.     Unknown by IDS and RUSS, and the public, HERMAN had materially and substantially failed to perform the duties of CFO and CPA, including bookkeeping, accounting, and tax functions, in a competent and appropriate manner.

43.     Unknown to IDS and RUSS, and the public, the following significant and material information was not disclosed by any of the defendants, through negligence, or was kept secret and concealed from IDS and RUSS and the public by the individual defendants, the Audit Committee of the Board of Directors of VMS, and the Board: the actual grounds for termination of HERMAN, the specific failures, errors and lapses on the part of HERMAN, the problems that HERMAN caused or contributed to, the errors and irregularities which then existed in public filings of financial information, the errors and irregularities which then existed in the books and records of VMS, the full scope of remediation necessary, the likely and substantial cost thereof, the fact that VMS lacked the funds to cause the work to be performed and fully re-mediated, the fact that VMS would need to borrow to do so or curtail operations, and that the cost of such work and remediation could, or likely would, materially adversely effect VMS.

12

44.     At or about the time of the termination of HERMAN, the individual defendants, the Audit Committee of the Board of Directors of VMS, and the Board, knew or should have known that IDS and RUSS would review and rely upon the public filings of information by VMS in connection with the binding Letter of Intent, and Sale Transaction, and would continue to do so up to and including the closing of the Sale Transaction, which occurred on April 2, 2008, but that they would not have the benefit of the Secret Information, and would therefore be materially misled.

45.     At or about the time of the termination of HERMAN, the individual defendants, the Audit Committee of the Board of Directors of VMS, and the Board, knew or should have known, that they were failing to reveal, and were concealing, the weakened, compromised and debilitated financial condition of VMS prior to, and on April 2, 2008, which was not appropriately reflected in any public filings.

46.     At or about the time of the termination of HERMAN, the individual defendants, the Audit Committee of the Board of Directors of VMS, and the Board, knew or should have known that they were, through acts and/or omissions constituting negligence, or fraudulently, inducing IDS and RUSS to consummate the Sale Transaction and acquire the securities sold and issued in furtherance thereof, and accept the conversion rate as reasonable.  Such securities were a debt instrument with a right of conversion to common stock at a share price of approximately $1.15 per common share.

47.     At or about the time of the termination of HERMAN, the individual defendants, the Audit Committee of the Board of Directors of VMS, and the Board, knew or should have known that they were, through acts and/or omissions constituting negligence, or fraudulently, failing to

disclose, and were concealing, facts and events of adverse company financial and operational performance and mismanagement.

48.     At the time of the termination of HERMAN, the individual defendants, the Audit Committee of the Board of Directors of VMS, and the Board, knew or should have known that they were, through acts and/or omissions constituting negligence, or fraud, failing to make the proper inquiries and failing to obtain appropriate answers of senior management and officers of VMS, and attorneys and accountants for VMS, in relation to the obligations of VMS in the Sale Transaction and under the development Agreement, and were acquiring valuable assets from IDS, without the ability to pay therefore, and without the ability to avoid a default in making payments after the closing of the Sale Transaction, and that the conversion price was over-stated, unreasonable and excessive.

49.     On or about February 12, 2008, GONZALEZ and the Board terminated HERMAN for cause. On February 20, 2008, GONZALEZ and the Board made a limited and deceptive public announcement, as follows:

> 20-Feb-2008
>
> Change in Directors or Principal Officers
>
> ITEM 5.02 DEPARTURE OF DIRECTORS OR PRINCIPAL OFFICERS; ELECTION OF DIRECTOR; APPOINTMENT OF PRINCIPAL OF OFFICERS
>
> On February 12, 2008, the Visual Management Systems, Inc. (the "Company") appointed Frank Schmid as Interim Chief Financial Officer... Also on February 12, 2008, the employment of Howard Herman who served as Chief Financial Officer of the Company, terminated.
> (Emphasis added)

14

50.     In the limited and deceptive public announcement, VMS did not even indicate that VMS had terminated the employment of HERMAN, allowing the interpretation that HERMAN had resigned of his own accord and without cause.

51.     At or about the time of the termination of HERMAN and the limited and deceptive public announcement, the individual defendants, the Audit Committee of the Board of Directors of VMS, and the Board, knew or should have known that the public filings of information by VMS were incorrect, inaccurate, incomplete and materially misleading.

<strong>THE SALE TRANSACTION AND AGREEMENTS</strong>

52.     On April 2, 2008, the Sale Transaction was consummated and numerous agreements were executed and delivered by the parties thereto, via fax. Among those were an Asset Purchase Agreement, a Consulting Agreement, an Unsecured Convertible Promissory Note in the face amount of $1,544,000 ("Securities"), and the Development Agreement. All of the agreements are binding and enforceable according to their terms.

53.     The agreements were and are governed by the laws of the State of New York, with jurisdiction of any dispute within the Federal or State Courts of New York.

54.     Every agreement entered into under the laws of the State of New York has implied covenants of good faith and fair dealing.

<strong>THE PUBLIC ANNOUNCEMENT SIX (6) DAYS AFTER THE<br>CLOSING OF THE SALE TRANSACTION</strong>

55.     Up to and including April 2, 2008, when the Sale Transaction was consummated by fax through the attorneys and became effective, the individual defendants, the Audit Committee of the Board of Directors of VMS, and the Board continued to fail to disclose and concealed the Secret

15

Information, and continued to induce IDS and RUSS to execute the transactional documents, without disclosing the Secret Information.

56.     Up to and including April 2, 2008, IDS and RUSS acted through their attorneys, Sonnenschein, Nath & Rosenthal, LLP, and specifically, Paul Gajer Esq. ("Gajer") and Jody Gallegos Esq. ("Gallegos").   Gallegos was in frequent communication with Geoff Martin Esq. ("Martin"), in-house counsel for VMS, leading to the closing of the Sale Transaction.  At no time did Martin inform or advise Gallegos or Gajer of the Secret Information, or the deterioration of the finances of VMS, or correct or rectify any of the acts or omissions constituting negligence, or fraud, practiced by the individual defendants, the Audit Committee of the Board of Directors of VMS, and the Board. In an email dated January 30, 2008, Martin wrote to RUSS, Gajer and GONZALEZ that VMS had "on going difficulty with our CFO and the release of financial information for an 8-k/a we promised the SEC in December" and referred to a "problem with Howard" but did not then or otherwise fully disclose and explain the difficulty or problem. In fact, Martin wrote that the accounting problems were "technical and by no means substantial." These statements were misleading to RUSS and Gajer.

57.     Merely six days later, on April 8, 2008, GONZALEZ and the Board of Directors of VMS made a stunning public announcement in the very same public announcement in which the Sale Transaction was reported, as follows:

> ITEM 4.02 NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW
>
> On April 7, 2008, the Audit Committee of the Company's Board of Directors concluded that the previously issued financial statements contained in the Company's Quarterly Reports on Form 10-QSB for the three and six months ended August 31, 2007, the three and nine

16

months ended September 30, 2007, and the pro forma consolidating balance sheet as of May 31, 2007, pro forma statement of operations for the three months ended May 31, 2007, and pro forma statement of operations for the 12 months ended February 28, 2007 contained in the Company's Form 8-K/A filed with the Securities and Exchange Commission (the "SEC") on January 31, 2008 (which amended our Form 8-K filed on July 23, 2007) should not be relied upon because of errors that require a restatement of such financial statements.

In April 2008, in conjunction with the audit of the Company's financial statements for the year ended December 31, 2007, the Company's management, after discussions with the Company's independent registered public accounting firm, determined that its previously issued financial statements for the periods identified above overstated revenues and misstated costs of goods sold, inventory and equity due to, among other things, the failure to properly account for intercompany sales and inventory and the failure to maintain proper controls over accounting procedures.

The Company will file with the SEC a Quarterly Report on Form 10-QSB/A for the three months ended August 31, 2007, a Form 10-QSB/A for the quarter ended September 30, 2007 and a Form 8-K/A containing a pro forma consolidating balance sheet as of May 31, 2007, pro forma statement of operations for the 3 months ending May 31, 2007, and pro forma statement of operations for the 12 months ending February 28, 2007, to reflect the changes required as a result of the restatement. Management is still in the process of quantifying the full impact of these restatements and cannot, at this time, accurately disclose the total effect on the financial statements that will be restated.

The Company's Audit Committee has discussed this matter with the Company's independent registered public accounting firm. The Company's independent registered public accounting firm has been given a copy of the disclosure that the Company is making in this hem 4.02 of this Report on Form 8-K and has been asked to furnish a letter to the Securities and Exchange Commission stating whether it agrees with the statements made by the Company in this Item 4.02. A copy of a letter from the independent registered public accounting firm advising that it agrees with the statements in this Item 4.02 is filed as Exhibit 7.1 hereto.
(Emphasis added)

17

## VMS'S  IMMEDIATE AND DEEPENING DEFAULT

58.     VMS defaulted under the Development Agreement with HC immediately after the closing of the Sale Transaction, in failing to pay development fees due for the first half of April 2008. This default delayed the ability of RUSS to recover monies he had advanced to HC.  VMS defaulted under the Asset Purchase Agreement, immediately, by failing to pay adjustments due at closing. This default deprived IDS of monies due.

59.     While actively defaulting, VMS was enjoying, benefiting from, and commercially exploiting the assets and technology that it procured from IDS.  On May 6, 2008, GONZALEZ was interviewed about the transaction, an audio file of which is available on the internet at zangani.com. GONZALEZ described the acquisition of IDS's assets and technology as a "major step" for VMS. VMS also developed a website to market one facet of IDS's assets and technology, a hybrid DVR under    the    trade    name    "Intelligent    Product    Development    Group    (IPDG)"    at www.intelligentpdg.com.

60.     VMS defaulted under the Asset Purchase Agreement and Consulting Agreement in or about July 2008, by failing to pay consulting fees.  This default deprived IDS and RUSS of monies due.

61.     On June 10, 2008, THE PLAN made a loan to VMS, and VMS issued a promissory note in favor of THE PLAN in the principal amount of $267,192, with an interest rate of 10% per annum.

62.     By August 1, 2008, VMS ceased all payments to IDS and RUSS.

63.     Although entitled to declare the defaults and accelerate all sums due, including the principal due under the Unsecured Convertible Promissory Note in the face amount of $1,544,000,

IDS and RUSS, voluntarily chose to not do so at that time.

64. On December 10, 2008, VMS defaulted on the promissory note to THE PLAN, which had then matured and was due and owing.

65. By the end of December 2008, VMS had not made any additional payments to IDS, RUSS, or THE PLAN, or cured any of its defaults.

66. On January 23, 2009, VMS made a public announcement admitting its unpaid obligations to IDS, RUSS and THE PLAN, as follows:

> The Company has not made a series of scheduled payments of amounts due to Intelligent Digital Systems, LLC ("IDS") as part of the Company's purchase of substantially all of IDS'S assets in April 2008, nor has the Company made a series of payments due as part of a related consulting agreement between the Company and IDS'S sole member Jay RUSS, a former member of the Company's board of directors. The Company is currently past due on $24,000 in payments owed to IDS, and past due to Jay RUSS for consulting fees as of January 20, 2009 of $43,750.

> Non-payment of these amounts may be considered default events under the relevant agreements between the Company and IDS and the consulting agreement with Mr. RUSS, but no formal notice of default or request for remedies in the case of default have been issued to the Company by IDS or Mr. RUSS. As a result of default, IDS is entitled to demand payment of the entire $1,544,000 principal amount of the note issued to IDS as primary compensation for its assets and all accrued and unpaid interest thereon, and Mr. RUSS has the right to demand payment of the aggregate $ 206,250 remaining due under the consulting agreement.

> On June 10, 2008, the Company issued a promissory note (the "Note") in the principal amount of $267,192, with an interest rate of 10% per annum, to a pension plan formed for the benefit of Jay RUSS. Pursuant to its terms, the Note came became due on December 10, 2008, but was not paid by the Company. The Company and Jay RUSS have entered into no agreement as to any modification of the terms of the Note, including a revised date of maturity, and an anticipated date when the Company will be able to make full payment on the Note is currently unknown.

19

67.     On February 6, 2009, given no alternative, IDS, RUSS and THE PLAN declared the defaults in writing and accelerated all sums due, and notified the individual defendants and VMS of its claims and the imminent commencement of litigation.

## THE DRAMATIC EFFECT OF THE RESTATEMENTS

68.     The restatement of the August 31, 2007 financial statements revealed the following with regard to the original August 31, 2007 financial statements, upon which IDS, RUSS and THE PLAN relied: a) that inventory was materially overstated by $973,000 or 68%; accounts payable were materially overstated by $823,000 or 38%; b) additional paid in capital was materially understated by $1,085,850 or 21%; c) revenue was materially overstated by $937,000 or 35%; d) gross profit was materially overstated by $958,000 or 60%; and e) operating expenses were materially overstated by $554,000 or 20%.

69.     The net result of all of these adjustments was an additional $429,000 loss for the three months ended August 31, 2007.

70.     The restated financial statements were also presented for the six months that ended August 31, 2007 and contained the following material adjustments:  Gross profit was overstated by $1,100,000 or 46% and net loss was understated by $701,000 or 35%.

71.     The restatement of the September 30, 2007 financial statements revealed the following with regard to the original September 30, 2007 financial statements, upon which IDS, RUSS and THE PLAN relied: a) inventory was materially overstated by $554,000 or 50%; b) accounts payable were materially overstated by $325,700 or 17%; c) additional paid in capital was materially understated by $1,540,871 or 29%; d) revenue was materially overstated by $1,246,000 or 40%; e) gross profit was materially overstated by $391,000 or 32%; and f) operating expenses

were materially understated by $1,321,900 or 84%.

72.     The net result of all of these adjustments was an additional $1,737,082 loss for the quarter ended September 30, 2007.

73.     The restated financial statements are also presented for the nine months ended September 30, 2007 and have the following material adjustments: Gross profit was overstated by $432,000 or 17% and net loss was understated by $1,231,000 or 35%.

## THE DRAMATIC ADMISSIONS IN THE FINANCIAL NOTES

74.     The Notes to the restated financial statements for August 31, 2007 and September 30, 2007 stated as follows:

> In November 2007 our management and the Audit Committee of our Board of Directors determined it was necessary to restate our Consolidated Statements of Operations for the three and six month periods ended August 31, 2007 due to the inclusion of inter-company sales in such items. Because of the required restatement of the Consolidated Statements of Operations, our Chief Executive Officer and Chief Financial Officer concluded that as of August 31, 2007, our disclosure controls and procedures were not effective based upon our misinterpretation of inter-company sales and revenues.

> In April 2008, in conjunction with the audit of the Company's financial statements as of and for the end of the year ended December 31, 2007, our management and the Audit Committee of our Board of Directors determined that it was necessary to again restate our financial statements for the three and six months ended August 31, 2007 and the three and nine months ended September 30, 2007, as well as the pro forma financial statements submitted with our Form 8K/A filed with the SEC on January 31, 2008, due to deficiencies in our accounting practices relating to revenue recognition , inventory, cost of goods sold and equity.

> These failures resulted from:

> misunderstandings of certain applications of Generally Accepted Accounting Principles (GAAP) and poor oversight and management of accounting staff and technology by our former Chief Financial

Officer;

deficiencies in our information technology relating to inventory control, revenue recognition, financial forecasting and the management of inter-company transactions;

a lack of uniformity in accounting policies across subsidiaries which allowed and increased the number of undetected discrepancies in inter-company transactions;

the lack of a formal documented closing process for period ends; and

the lack of a formal process for developing recent period results or forward looking financial forecasts.

We have taken steps to improve our disclosure controls and procedures, including the replacement of our Chief Financial Officer, the hiring of in-house legal counsel, continued utilization of the oversight of an outside accounting firm in the preparation of our financial statements, retaining additional experienced independent accounting consultants, reorganizing our accounting department, obtaining and implementing new policies for the entry and maintenance of financial records, the development of processes for taking more frequent physical inventory, and obtaining approval from our Board of Directors to substantially upgrade our accounting software. In addition, we have engaged Withum Smith & Brown Global Assurance to evaluate our internal controls over financial reporting and assist us in developing internal controls Which will enable us to comply with Section 404 of the Sarbanes-Oxley Act of 2002. Other than the changes described above, there have been no other changes in our disclosure controls and procedures that have materially affected, or are reasonably likely to materially affect, our disclosure controls and procedures.

Management will continue to scrutinize the steps we have detailed above to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms. If upon further evaluation the steps detailed above prove too slow or insufficient in their totality to meet that goal, we will develop a new plan which includes changes necessary to ensure that we comply with all relevant Commission rules and forms. (emphasis added)

75.     Based upon the foregoing, in or about November 2007 and December 2007, GONZALEZ and the Audit Committee of VMS, and VMS learned, or were informed that VMS's August 31, 2007 and September 30, 2007 financial statements and public filings of financial information were erroneous, deficient, inaccurate and needed to be restated, but neither GONZALEZ and the Audit Committee of VMS, nor VMS revealed same to IDS and RUSS, or the public, nor did they take immediate and appropriate action to analyze and correct same. GONZALEZ and the Audit Committee of VMS, and VMS compounded the circumstances by withholding the December 31, 2007 financial statements until August 28, 2008 and withholding the March 31, 2008 financial statements until May 20, 2008.  In doing so, GONZALEZ and the Audit Committee of VMS, and VMS, were depriving IDS and RUSS, and the public of financial statements other than the August 30, 2007 and September 31, 2007 financial statements, which were known by them to be flawed and unreliable.  On or about January 30, 2008, VMS publicly filed an amendment of an 8K, which was filed on July 23, 2007, and thereafter amended on August 8, 2007 and October 26, 2007.  The amendment relates to the merger of an entity known as VMS Acquisition with VMS in a one (1) for seven (7) reverse split, and the financial statement as of May 31, 2007.  There is no detail of VMS's expenses.  The amendment did not disclose the Secret Information, or correct the deficiencies or inaccuracies in the public filings.

76.     GONZALEZ and the Audit Committee of VMS, and VMS permitted, induced and allowed all phases of the Sale Transaction and execution and delivery of agreements with IDS and RUSS to proceed, through binding Letter of Intent, and closing, without revealing the adverse facts to IDS and RUSS.  In addition, GONZALEZ and the Audit Committee of VMS, and VMS permitted, induced and allowed IDS and RUSS to materially alter its and their positions in reliance

23

on the ability of VMS to perform thereunder.  In addition, GONZALEZ and the Audit Committee of VMS, and VMS, permitted, induced and allowed RUSS to assume a position on the Board of Directors of VMS, without being aware of any of the foregoing.

77.    RUSS resigned as a Board member, in writing, on December 12, 2008.

78.    IDS, RUSS and THE PLAN would not have altered their positions, dismantled the IDS business, transferred control of Chang, entered into the Sale Transaction, executed and delivered the agreements, made loans, or engaged in any business with VMS, whatsoever, had the adverse facts and Secret Information been revealed in a timely and proper manner, and had VMS accurately reported its financial condition to IDS, RUSS and THE PLAN, and the public.

### FIRST CLAIM FOR RELIEF
(For Negligence and Negligent Misrepresentation and Mismanagement
On Behalf of All Plaintiffs Against All Defendants)

79.    Plaintiffs repeat and re-allege paragraphs 1-78 of the Complaint, as if fully set forth herein.

80.    The individual defendants each had certain duties and fiscal responsibilities when serving in their respective capacities for VMS.

81.    The individual defendants each had duty to perform his duties with due care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances.

82.    The individual defendants each had duties, including managing and operating VMS and its affairs including, without limitation, drafting and disseminating information about VMS in a reasonably prudent manner.

83.    By reason of the negligence, and the acts and omissions constituting negligence, and

24

culpable conduct of the individual defendants, and mismanagement, and as a proximate cause thereof, IDS, RUSS and THE PLAN have been damaged.

## SECOND CLAIM FOR RELIEF
(For Common Law Fraud and Fraud in the Inducement
On Behalf of All Plaintiffs Against All Defendants)

84.     Plaintiffs repeat and re-allege paragraphs 1-83 of the Complaint, as if fully set forth herein.

85.     By reason of the misrepresentations or omissions of material fact, and the reasonable reliance of IDS, RUSS and THE PLAN thereon, and as a proximate cause thereof, IDS, RUSS and THE PLAN have been damaged.

## THIRD CLAIM FOR RELIEF
(For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
On Behalf of IDS Against All Defendants)

86.     Plaintiffs repeat and re-allege paragraphs 1-85 of the Complaint, as if fully set forth herein.

87.     Defendants concealed the Adverse Facts and Secret Information, and disseminated or approved incomplete, erroneous, and false statements, and August 31, 2007 and September 31, 2007 financial statements, which they knew or, in the exercise of reasonable care should have known but recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

88.     Defendants violated  §20(b) of the 1934 Act and Rule 10b-5 in that they:

a) Employed devices, schemes, and artifices to defraud;
b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

25

c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon IDS in connection with its purchase of securities of VMS.

89.    IDS has suffered damages in that it would not have purchased the securities at all, if they had been aware of the adverse facts, Secret Information and incompleteness, errors and falsity of the statements, and August 31, 2007 and September 31, 2007 financial statements.

90.    As a direct and proximate result of the wrongful conduct, IDS suffered damages in connection with its purchases of securities of VMS.

**FOURTH CLAIM FOR RELIEF**
(For Violation of Section 20(a) of the 1934 Act
On Behalf of IDS Against GONZALEZ)

91.    Plaintiffs repeat and re-allege paragraphs 1-90 of the Complaint, as if fully set forth herein.

92.    GONZALEZ acted as controlling persons of VMS within the meaning of (a) of the 1934 Act.

93.    By reason of his positions as an officer and director of VMS, and his ownership of stock and stock options, GONZALEZ had the power and authority to cause VMS to engage in the wrongful conduct complained of herein.

94.    GONZALEZ is a "control person" due to his high-level position with VMS, extensive day-to-day involvement with VMS and all of its operations, unlimited access to VMS information, power to control or influence, which gave him control over misstatements and omissions alleged in the complaint.

95.    By reason of such conduct, GONZALEZ is liable pursuant to §20(a) of the 1934 Act.

### FIFTH CLAIM FOR RELIEF
(For Non-Payment of the Unsecured Convertible Promissory Note
On Behalf of IDS Against VMS)

96. Plaintiffs repeat and re-allege paragraphs 1-95 of the Complaint, as if fully set forth herein.

97. The Unsecured Convertible Promissory Note has been accelerated, declared due and owing, and notice thereof has been given, in writing.

98. Notwithstanding the foregoing, VMS has made no payments thereon.

99. IDS has been damaged in the full amount thereof. In addition, the Unsecured Convertible Promissory Note entitles the prevailing party in a suit to recover reasonable attorneys' fees and expenses.

### SIXTH CLAIM FOR RELIEF
(For Non-Payment of the Consulting Fees
On Behalf of RUSS Against VMS)

100. Plaintiffs repeat and re-allege paragraphs 1-99 of the Complaint, as if fully set forth herein.

101. The Consulting Agreement has been accelerated, declared due and owing, and notice thereof has been given, in writing. Notwithstanding the foregoing, VMS has made no payments thereon since July 2008.

102. RUSS has been damaged in the full amount of the balance thereof.

### SEVENTH CLAIM FOR RELIEF
(For Non-Payment of the Promissory Note
On Behalf of THE PLAN Against VMS)

103. Plaintiffs repeat and re-allege paragraphs 1-102 of the Complaint, as if fully set forth herein.

27

104. The promissory note to THE PLAN has been accelerated, declared due and owing, and notice thereof has been given, in writing. THE PLAN is the holder of the note.

105. Notwithstanding the foregoing, VMS has made no payments thereon.

106. THE PLAN has been damaged in the full amount thereof. In addition, the note provides for the recovery by THE PLAN of all costs and expenses, including reasonable attorneys' fees.

### EIGHTH CLAIM FOR RELIEF
(For Breach of the Asset Purchase Agreement
On Behalf of IDS Against VMS)

107. Plaintiffs repeat and re-allege paragraphs 1-106 of the Complaint, as if fully set forth herein.

108. VMS has breached the Asset Purchase Agreement.

109. IDS has been damaged by such breach.

WHEREFORE, Plaintiffs demand judgment, as follows:

A. With respect to the First Claim For Relief: awarding each of the Plaintiffs compensatory and punitive damages, interest, attorneys' fees, expenses and costs; and

B. With respect to the Second Claim For Relief: awarding each of the Plaintiffs compensatory and punitive damages, interest, attorneys' fees, expenses and costs; and

C. With respect to the Third Claim For Relief: awarding IDS compensatory and punitive damages, interest, attorneys' fees, expenses and costs; and

D. With respect to the Fourth Claim For Relief: awarding IDS compensatory damages, interest, attorneys' fees, expenses and costs; and

E. With respect to the Fifth Claim For Relief: awarding IDS compensatory damages,

28

interest, attorneys' fees, expenses and costs; and

  F. With respect to the Sixth Claim For Relief: awarding RUSS compensatory damages,

interest, attorneys' fees, expenses and costs; and

  G. With respect to the Seventh Claim Or Relief: awarding THE PLAN compensatory

damages, interest, attorneys' fees, expenses and costs; and

  H. With respect to the Eighth Claim For Relief: awarding IDS compensatory damages,

interest, attorneys' fees, expenses and costs; and

  I. Together with the costs and disbursements of this action.

Dated: New York, New York
    March 5, 2009

          REED SMITH LLP

          By: _____
           Paul E. Breene (PB-7989)
           Attorney for Plaintiffs
           559 Lexington Avenue
           22nd Floor
           New York, NY 10022
           (212) 205-6023
           pbreene@reedsmith.com

         Co-Counsel

           IRA LEVINE, Esq. (IL-1469)
           320 Northern Blvd. Suite 14
           Great Neck, NY 11021
           (516) 829-7911
           ilevinelaw@verizon.net

29